# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| EUGENE MCCLURG, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) **CIVIL ACTION NO.** ) |
| vs. | ) ) ) **CLASS ACTION COMPLAINT** |
| | ) ) |
| BP, PLC, BP AMERICA, INC., ANTHONY B. HAYWARD, LORD EDMUND JOHN PHILIP BROWNE, ANDREW G. INGLIS, CARL-HENRIC SVANBERG, H. LAMAR MCKAY, SIR WILLIAM M. CASTELL, PAUL M. ANDERSON, ANTONY BURGMANS, CYNTHIA CARROLL, ERROLL B. DAVIS, JR. and PETER SUTHERLAND, | ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Plaintiff, Eugene McClurg ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BP, plc ("BP" or the "Company") and securities analysts' reports and advisories about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of all investors who purchased or otherwise acquired American Depository Shares ("ADS") of BP between June 30, 2005 and June 1, 2010, inclusive (the "Class Period"). This action seeks remedies under the Securities Exchange Act of

1

1934 (the "Exchange Act").

2.      BP is one of the world's largest energy companies, providing its customers with fuel for transportation, energy for heat and light, retail services and petrochemicals products. Among other things, the Company engages deepwater drilling for hydrocarbons around the globe including in the Gulf of Mexico (the "Gulf").

3.      Since at least June 2005, the Company has touted the Gulf as one of its "largest area of growth in the US."   BP's statements about the Gulf, however, completely failed to disclose that its operations were being conducted in a highly reckless manner as it lacked any legitimate plan to respond to an oil spill from its drilling activities in the region.

4.      Exacerbating the probability that BP's inadequate spill response would actually be relied upon to respond to a sizable spill, BP has for years maintained a corporate culture where adherence to safety protocols and environmental laws were ignored in favor of profits.  BP's culture of placing profits over the safety of its employees and the laws of the United States led to a 2005 explosion in Texas City, Texas which led to the deaths of 15 people and two oil spills in Alaska in 2006.  In both cases, BP pled guilty to criminal violations and subsequently assured investors that safety would be a guiding principle of the Company's operations.  The Company's public statements routinely detailed the specific steps taken by BP to reform its culture while reducing the possibility that lapses leading to the disaster in Texas City and Alaska would be repeated in the future.

5.      On night of April 20, 2010, the risks concealed by BP's inadequate spill response plan and its false assurances about its organizational changes to improve its culture began to materialize when, at the Company's Macondo prospect site about 50 miles off of the Louisiana coast in the Gulf, an eruption of oil or natural gas occurred leading to an intense fire on the

Deepwater Horizon semisubmersible oil rig.  Eleven lives were lost in the disaster.  The Deepwater Horizon was leased by BP from Transocean and was drilling an exploratory well at the Macondo site.

6.     The fire on the Deepwater Horizon consumed the rig and eventually caused it to sink.  As the Rig sank, it pulled a pipe connecting the rig to the well (the "riser") with it.  The riser subsequently tore away from the well, and oil began leaking into the Gulf.  Crewmembers' efforts to trigger the blow out preventer ("BOP"), a device used to seal a well in an emergency, failed causing oil to spill into the Gulf.

7.     Rather than respond to the disaster with a definitive plan to contain the spill, BP began a trial and error approach to containing the oil by employing various tactics which were seemingly developed as the spill was raging.  Two months into the leak, BP's latest effort-- cutting the riser and capping it with a dome to capture some of the oil aboard surface ships--has reportedly been somewhat successful despite the fact that thousands of barrels of oil continue leaking into the Gulf.  BP's response to the spill evidences that the Company has no legitimate spill response plan.

8.     By late June oil had contaminated the coastlines of Louisiana, Alabama Mississippi and Florida.  Hundreds of miles of the United States Gulf coast, the livelihoods of people depending on the Gulf and thousands of animals are all impacted by the oil spill.  The Gulf spill has eclipsed the Exxon Valdez oil spill in Prince William Sound, Alaska, on March 24, 1989, to become the worst environmental disaster in the history of the United States.  As of late-June 2010, approximately 36% of the Gulf's fishing area is closed because of the spill.

9.     Despite the gravity of disaster, Defendant Anthony B. "Tony" Hayward, BP's Chief Executive Officer ("CEO"), initially responded to the crisis by downplaying the impact of

spill.  According to Hayward, "The Gulf of Mexico is a very big ocean. The amount of volume of oil and dispersant we are putting into it is tiny in relation to the total water volume."  BP also downplayed the initial amount of oil leaking into the Gulf by originally estimating that 5,000 barrels of oil were spilling into the Gulf per day.  Revised estimates put the actual amount closer to 60,000 barrels per day.

10.     The cost to BP's investors from the defendants' deceptive statements will run into the billions of dollars.  On June 16, 2010, after a meeting with President Obama, BP agreed to set aside $20 billion in an escrow account to compensate victims.   The $20 billion figure is reportedly a down payment of costs to be borne by BP and not a cap on BP's liability.

11.     The day after the creation of the $20 billion fund was announced, Hayward appeared before a Congressional committee investigating the explosion on the Deepwater Horizon.  Rather than assist the committee's investigation, Hayward provided evasive responses and was accused of "stonewalling" the investigation.   Congressman Waxman bluntly asked Hayward:  "Are you failing to cooperate with other investigators, as well . . .  Because they're going to have a hard time reaching conclusions if you stonewall them, which is what we seem to be getting today."  Congressman Waxman, who has been reviewing BP documents, also stated "BP's corporate complacency is astonishing. . .  BP cut corner after corner to save a million dollars here and a few hours or days there. And now the whole Gulf Coast is paying the price." Hayward was recalled to Europe days after giving testimony.

12.     The Company's investors have suffered massive losses from the materialization of the risks concealed by BP's operations.  At the time of the Rig explosion, BP shares traded for approximately $60.00 per ADS.  Since that time however, the Company's ADSs (and common shares) have fallen over 50%, eliminating approximately $100 billion in the Company's total

market capitalization value (as of June 28, 2010).

13.    The loss in value is directly related to the materialization of the risks created by BP's misleading statements and material omissions.  As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members suffered damages.

<u>**JURISDICTION AND VENUE**</u>

14.    The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16.    Venue is proper in this District pursuant to pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, BP maintains a significant presence within this District, and the Deepwater Horizon explosion occurred off the coast of Louisiana and this District.

17.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

<u>**PARTIES**</u>

18.    Plaintiff, Eugene McClurg, as set forth in the accompanying certification, incorporated by reference herein, purchased BP ADSs at artificially inflated prices during the Class Period and has been damaged thereby.

19.     Defendant BP a United Kingdom corporation with its principal executive offices located at St James's Square, London SW1Y 4PD, United Kingdom.

20.     Defendant BP America, Inc. ("BP America"), a subsidiary of BP, is a Delaware corporation with its principal place of business in Warrenville, Illinois.

21.     Defendant Anthony B. Hayward ("Hayward") has served as the Company's CEO since May 2007 and has served as an executive director of the Company since 2003.  Hayward has been employed by BP since 1982.  When Hayward assumed the CEO position he vowed to focus "like a laser" on safety.

22.     Defendant Lord Edmund John Philip Browne, Baron Browne of Madingley ("Browne") served as the Company's CEO from the beginning of the Class Period until April 2007.

23.     Defendant Andrew G. "Andy" Inglis ("Inglis") has served as the Company's Chief Executive, Exploration and Production and as an executive director of the Company since February 2007.  Prior to this, Inglis was Executive Vice President and Deputy Chief Executive of Exploration and Production.  Inglis began working for BP in 1980.

24.     Defendant Carl-Henric Svanberg ("Svanberg") has served as Chairman of the Board since January 1, 2010 and has served as a director of the Company since September 2009.

25.     Defendant H. Lamar McKay ("McKay") has served as Chairman and President BP America, Inc. since January 2009.

26.     Defendant Sir William M. Castell ("Castell") has served as a director of the Company since 2006.

27.     Defendant Paul M. Anderson ("Anderson") has served as a director of the Company since February 2010.

28.    Defendant Antony Burgmans ("Burgmans") has served as a director of the Company since 2004.

29.    Defendant Cynthia B. Carroll ("Carroll") has served as a director of the Company since 2007.

30.    Defendant Erroll B. Davis, Jr. ("Davis") was, at relevant times, a director of the Company, which was a position he held since 1998.

31.    Defendant Peter Sutherland ("Sutherland") served as BP's Chairman from 1997 until 2009.

32.    Defendants Hayward, Browne, Inglis, Svanberg, McKay, Castell, Anderson, Burgmans, Carroll, Davis and Sutherland are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BP's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

## SUBSTANTIVE ALLEGATIONS

## BP's History Of Safety Lapses

33.     BP is one of the world's largest energy companies, providing its customers with fuel for transportation, energy for heat and light, retail services and petrochemicals products. The Company was founded in 1889 and is headquartered in London, U.K.

34.     The Company's Exploration and Production segment deals with oil and natural gas exploration, field development and production, and marketing and trading of natural gas, including liquefied natural gas, power and natural gas liquids. It has exploration and production activities in Angola, Azerbaijan, Canada, Egypt, the Russian Federation, Trinidad and Tobago, Norway, the United Kingdom, and the United States, as well as in the Asia Pacific, Latin America, North Africa, and the Middle East. The Refining and Marketing segment provides the supply and trading, refining, marketing and transportation of crude oil, petroleum and petrochemical products and related services to wholesale and retail customers under the brand names of Aral, Amoco, ARCO, BP and Castrol. The Other Businesses and Corporate segment produces and markets rolled aluminum products and generates energy through wind, solar, biofuels, hydrogen and carbon capture and storage.

35.     Over the past several years, BP has been at the center of a number of catastrophic incidents that have taken an enormous toll on lives and resources.  For example, on March 23, 2005, an explosion at BP's refinery in Texas City, Texas killed 15 people and was one of the worst refinery disasters in the history of the United States.  The Texas City disaster led to a series of investigations from BP and government regulators.  Among other things, a report by the U.S. Chemical Safety And Hazard Investigation Board (CSB) chided BP for maintaining a culture where employees were discouraged from raising problems with managers.  The Texas City

disaster led to BP pleading guilty to one felony count and paying a $50 million criminal fine.  In October 2009, the Occupational Safety and Health Administration ("OSHA") issued an $87.4 million civil penalty – the largest in its history – against BP for alleged process safety management violations.

36.     Concurrently with the settlement of charges relating to the Texas City explosion, the Company settled charges relating to two oil leaks in Prudhoe Bay, Alaska.  The leaks occurred in March and August of 2006, and according to the DOJ "were the result of BP[]'s failure to heed many red flags and warning signs of imminent internal corrosion that a reasonable operator should have recognized."  Congressional hearings following the 2006 Alaskan spill accused BP's management of implementing "'draconian' budget cuts that affected safety and health, including limiting the use of a corrosion inhibitor inside the pipeline, a step that could have prevented the deterioration that led to the 2006 spill."[1]

37.     The DOJ imposed a $20 million fine on BP for the spills in Alaska.  The fine was accompanied by BP's Alaska subsidiary entering into a criminal plea agreement with the DOJ for a misdemeanor violation of the US Federal Water Pollution Control Act.

**BP's Operations In The Gulf**

38.     Against the backdrop of routinely violating safety standards the Company was expanding its operations in the Gulf and touting the development of the Gulf as a material component of its business.  In the Company's 2004 annual report (filed with the SEC on June 30, 2005) BP stated, "Deepwater Gulf of Mexico is one of our new profit centres and our largest area of growth in the United States."  Similar statements were made in each of the Form 20-Fs filed

---

[1]        *See* Abrahm Lustgarten, "Congressmen Raised Concerns About BP Safety Before Gulf Oil Spill," *ProPublica* (May 4, 2010).

during the Class Period.  In addition, the Company's operations in the Gulf have been vital to BP's oil production throughout the Class Period, providing 28% of BP's daily oil output (excluding equity-accounted entities) in 2009, up from 16% in 2004.

### The Explosion on the Deepwater Horizon

39.     Beginning in fall of 2009, BP began drilling the Macondo oil reservoir, which is located 50 miles of the coast of Louisiana.  The Macondo well, which was being drilled by the Deepwater Horizon semisubmersible rig, is an exploratory site that was not yet actively producing oil for BP.  Once fully dug, the Deepwater Horizon's instructions were to cap the well and wait for engineers to determine how to extract the oil.  As of April 20, 2010, the Deepwater Horizon – 29 days over its schedule – had drilled 13,000 feet below the seafloor.

40.     On the night of April 20, 2010, as BP was continuing the process of capping the well a number of explosions set fire to the Deepwater Horizon.

41.     The preliminary accounts of the April 20 disaster point to a series of missteps by BP officials leading to hurried and incomplete safety testing in the weeks leading up to the disaster.  According to *The Wall Street Journal*, "BP made choices over the course of the project that rendered this well more vulnerable to the blowout. . . .  Some of BP's choices allowed it to minimize costly delays" in a project weeks behind schedule.[2]  For example:

- BP cut short a procedure involving drilling fluid that is designed to detect gas in the well and remove it before it becomes a problem, according to documents belonging to BP and Transocean.  The test required circulation of mud for six to twelve hours, BP's circulated mud for 30 minutes.

- In an April 18 report to BP, Halliburton warned that if BP didn't use more centering devices, the well would likely have "a SEVERE gas flow problem."  Still, BP decided to install fewer

---

[2]     *See* Ben Casselman, "BP Decisions Set Stage for Disaster," *The Wall Street Journal* (May 27, 2010).

of the devices than Halliburton recommended—6 instead of 21.

- a BP manager overseeing final well tests apparently had scant experience in deep-water drilling. He told investigators he was on the rig to "learn about deep water" drilling.

- When mud was removed from the well and cement was being poured in, BP failed to run tests to determine whether the cement was sealing properly. Workers from a company able to perform such tests were sent back to land by BP 12 hours before the explosion.

42.     Additional reports from persons aboard the Deepwater Horizon on April 20 state that BP and Transocean officials argued about how mud should be removed from the well on the day of the disaster. BP's view carried the day. Following BP's instruction, Transocean workers reportedly turned to replace the mud in the well with seawater.[3] Shortly after the process for removing mud began, seawater, mud and gas began to head up the pipe. The gas ignited leading to an intense fire aboard the Deepwater Horizon. The fire burned for hours eventually causing the Deepwater Horizon to sink.

43.     As the Deepwater Horizon sank, it pulled a riser connecting the Deepwater Horizon to the BOP. When the riser eventually tore, oil began to spew from the Macondo well into the Gulf. Moreover, the BOP – the final protection against a full blown spill – failed to operate when crewmembers attempted to activate the device. Millions of barrels of oil have leaked into the Gulf since the explosion.

44.     On May 29, 2010, *The New York Times* published an article based on internal BP documents showing that BP had specific concerns about the well design and the BOP at the Gulf disaster site more than 11 months ago and that BP officials expressed concerns about a loss of

---

[3]     *See* Ben Casselman, "BP Decisions Set Stage for Disaster," *The Wall Street Journal* (May 27, 2010).

"well control" as late as March 2010.[4]  According to the *New York Times*:  "On June 22 [2009] . . . .  BP engineers expressed concerns that the metal casing the company wanted to use might collapse under high pressure.  'This would certainly be a worst-case scenario,' Mark E. Hafle, a senior drilling engineer at BP, warned in an internal report. 'However, I have seen it happen so know it can occur.'  The company went ahead with the casing, but only after getting special permission from BP colleagues because it violated the company's safety policies and design standards. The internal reports do not explain why the company allowed for an exception."[5]  In March 2010 BP official reported "problems on the rig that included drilling mud falling into the formation, sudden gas releases known as 'kicks' and a pipe falling into the well, BP officials informed federal regulators that they were struggling with a loss of 'well control.'  On at least three occasions, BP records indicate, the blowout preventer was leaking fluid, which the manufacturer of the device has said limits its ability to operate properly."[6]  The Times analysis of BP documents "show that there were serious problems and safety concerns with the Deepwater Horizon rig far earlier than those the company described to Congress" in May 2010.[7]

45.    BP's partners involved in drilling and operation of the Macondo well have directly blamed the Company for the disaster.   For example, Anadarko Petroleum Corp., a minority partner of BP in the well, issued a statement on June 18, 2010, accusing BP of "gross negligence or willful misconduct" in the operation of the Macondo well.  Anadarko's CEO further stated, "The mounting evidence clearly demonstrates that this tragedy was preventable and the direct result of BP's reckless decisions and actions."

---

[4]        Ian Urbina, "Documents Show Early Worries About Safety of Rig," *New York Times* (May 29, 2010).

[5]        *Id.*

[6]        *Id.*

[7]        *Id.*

46.     The fallout from the reckless nature of the Company's actions when drilling the Macondo well were compounded by the fact that BP has been drilling in the Gulf throughout the Class Period without a legitimate spill response plan for its operations.  The spill response plan BP had for the Macondo well grossly misrepresented BP's capabilities to respond to a spill by declaring that "[BP] has the capability to respond to the maximum extent practicable to a worst-case discharge."[8]  Other quotes from the Macondo well spill response plan highlight the reckless approach BP took in developing a response plan for the well.  According to the Company, an oil spill from the well would result in "No adverse activities to fisheries" or "No adverse impacts to endangered or threatened marine mammals."   Contrary to BP's assurances, the current spill has closed 36% of the fisheries in the Gulf and threatens hundreds of marine animals.

47.     With respect to the impact on the shoreline of the United States, the Macondo well spill response plan declares that: "***due to the distance to shore (48 miles) and the response capabilities that would implemented, no significant adverse impacts are expected***."[9]   Contrary to BP's assurances, hundreds of miles of coastline have been impacted by BP's oil spill.

48.     The Company's separate spill response plan for the Gulf region – a region touted by the Company as its "largest area of growth in the US" – is equally useless as it, among other things, discusses the impact to walruses from an oil spill in the Gulf.  Walruses have not lived in the Gulf in over 3 million years.  That regional plan also estimates a worst case leak of 250,000 barrels per day.   While the exact amount of oil spilling into the Gulf from the Macondo well has varied over time due to BP's false statements regarding the magnitude of the spill, the latest estimates suggest that 60,000 barrels are leaking into the Gulf per day.  BP has shown it is incapable of responding to such a spill significantly smaller than its own "worst case" estimates.

---

[8]     *See* http://climateaudit.org/2010/05/30/the-bp-oil-spill-response-plan/.

[9]     All emphases are added.

49.     The Macondo well continues to leak thousands of barrels of oil into the Gulf. BP's response to the spill has been virtually ineffective.   In all likelihood, oil will not stop flowing until a relief well is dug sometime this summer.

## Materially False and Misleading
## Statements Issued During the Class Period

50.     The Class Period begins on June 30, 2005.   On this day, the Company filed its Annual Report with the SEC on Form 20-F.   Included in this Form 20-F was a pledge that BP had implemented protocols to ensure regulatory and safety compliance by all employees.   The Company further stated that it seeks to conduct its activities in such a manner that there is no or minimum damage to the environment.   The Company's Form 20-F further set forth, in relevant part:

> BP operates in over 100 countries worldwide. In all regions of the world, **BP has processes to ensure compliance with applicable regulations. In addition, each individual in the Group is required to comply with the BP health, safety and environment policy and associated expectations and standards.** Our partners, suppliers and contractors are also encouraged to adopt them.
>
> *          *          *
>
> Deepwater Gulf of Mexico is one of our new profit centres and our largest area of growth in the United States.

51.     On February 6, 2006, Defendant Sutherland signed a "Chairman's Letter" which was disseminated to BP shareholders.   In this letter, Defendant Sutherland stated that "the ethics and environment assurance committee under Walter Massey's chairmanship enhanced its focus in the area of personal and process safety procedures in the light of the Texas City incident." Defendant Sutherland further stated that '[w]hile the board evaluation exercise we undertook this year indicated areas in which our practices should develop, the internal and external endorsement our board has received reassures us that the governance of your company is state-of-the-art."

14

52.     Also on February 6, 2006, Defendant Browne signed the "Group chief executive's review," which was disseminated to BP shareholders.  In reference to the Texas City disaster, Defendant Browne stated that BP was "determined to do everything possible to ensure that no such accident recurs."

53.     On June 30, 2006, BP filed its Annual Report with the SEC on Form 20-F.  The Company's June 30, 2006 Form 20-F contained similar statements regarding BP's compliance with regulations and commitment to safety as were set forth in the Form 20-F from the previous year.  The Company's June 30, 2006 Form 20-F stated, in relevant part:

> Management believes that the Group's activities are in compliance in all material respects with applicable environmental laws and regulations . . .
>
> BP operates in over 100 countries worldwide. ***In all regions of the world, BP has processes designed to ensure compliance with applicable regulations. In addition, each individual in the Group is required to comply with BP health, safety and environment policies as embedded in the BP Code of Conduct.*** Our partners, suppliers and contractors are also encouraged to adopt them.
> \*      \*      \*
> Deepwater Gulf of Mexico is one of our new profit centres and our largest area of growth in the United States.

54.     On February 23, 2007, Defendant Sutherland signed a "Chairman's Letter" which was disseminated to BP shareholders.  In this letter, Defendant Sutherland stated that "in the vast majority of our activities, we continue to be justly proud of our safety record, our environmental initiatives and our high ethical standards."  Defendant Sutherland further stated that "[a]bove all, we must ensure that, at all locations, those who work for us do so safely."  Defendant Sutherland assured BP investors that the board was fully committed to safety, and that it in fact "long had a tradition of emphasizing safety and, in nearly 20 years of reporting, we have seen a significant improvement in our safety performance."

55.     Also on February 23, 2007, Defendant Browne signed the "Group chief executive's review," which was disseminated to BP shareholders.  Defendant Browne stated that "[w]e have been urgently addressing operational issues and matters related to our safety performance," elaborating that "BP aspires to be an industry leader in the three dimensions of safety—personal safety, process safety and the environment."  Defendant Browne also vowed that the Company was implementing the Baker panel's recommendations, many of which were "consistent with our own internal reviews and our aim now is to develop a timely and intelligent plan of action in order to transform BP into an industry leader in process safety management."  Defendant Browne also referenced "an ambitious four-year programme of investment in safety and operational integrity right across the group and the creation of an advisory board of external experts to assist and advise BP America, Inc. in monitoring the operations of US businesses, with particular focus on compliance, safety and regulatory affairs."

56.     On March 6, 2007, BP filed its Annual Report with the SEC on Form 20-F.  The Company's March 6, 2007 Form 20-F contained many of the same assurance regarding safety and compliance as were found in BP's previous two Forms 20-F.  The Company's March 6, 2007 Form 20-F stated, in relevant part:

> **BP also implemented a number of actions relating to safety and operations, not only at US refineries but also at other facilities worldwide.** These actions include a decision to increase spending to an average of $1.7 billion a year over the next four years to improve the integrity and reliability of US refining assets, the formation of a safety and operations function to focus on operations and process safety across the group, the appointment of a new chairman and president of BP America Inc. and the creation of an advisory board to assist BP America Inc.'s management in monitoring and assessing BP's US operations.
>
> *             *             *
>
> BP has committed to implement the . . . . recommendations [from

the US Refineries Independent Safety Review Panel] and will consult with the panel on how best to do this across the US refineries and to apply the lessons learned elsewhere in its global operations.

\*     \*     \*

**In all regions of the world, BP has processes designed to ensure compliance with applicable regulations.** In addition, each individual in the group is required to comply with BP health, safety and environmental (HSE) policies as embedded in the BP code of conduct. . . .

This Environmental protection section focuses primarily on the US and the EU, where approximately 70% of our property, plant and equipment is located, and on two issues of a global nature: climate change programmes and maritime oil spills regulations.

\*     \*     \*

Good progress was made in developing and implementing a major six-point plan for improving safety and operational integrity.

\*     \*     \*

Deepwater Gulf of Mexico is one of our new profit centres and our largest area of growth in the US.

57.    On February 22, 2008, Defendant Sutherland signed a "Chairman's Letter" which was disseminated to BP shareholders.  In this letter, Defendant Sutherland welcomed Defendant Hayward as the Company's CEO, stating that Defendant Hayward's "clear focus has been on safety, people and performance."

58.    Also on February 22, 2008, Defendant Hayward signed the "Group chief executive's review," which was disseminated to BP shareholders.  Defendant Hayward stated that when he took over as CEO, "the immediate task was to restore the integrity and the efficiency of BP's operations.  I set out three priorities: safety, people and performance." Defendant Hayward further stated that "[a] new operating management system, designed to bring greater consistency to our operations, is being introduced. We continue to implement cross-group programmes designed to enhance operations leadership competence at all levels of BP."

Defendant Hayward then emphasized that BP was "redoubling" efforts "to make sure we have the right people in the right places.  Whether it be in our refineries, exploring in the ultra deepwater of the Gulf of Mexico . . . we know it is our people who make the difference."

59.   On March 4, 2008, BP filed its Annual Report with the SEC on Form 20-F.  The Company's Form 20-F stated, in relevant part:

> We believe our provisions are sufficient for known requirements; we do not believe that our costs will differ significantly from those of other companies engaged in similar industries, or that our competitive position will be adversely affected as a result.
>
> *           *           *
>
> **safety was maintained as the highest priority of the executive top team.**
>
> *           *           *
>
> Throughout 2007, BP continued to implement the process safety enhancement programme it initiated in response to the March 2005 incident [at Texas City], which included policies, practices and activities to address a number of the factors that contributed to the incident. . . .
>
> BP also implemented, across its US refining system and at other facilities worldwide, a number of additional actions relating to safety and operations, atmospheric relief valves, operating procedures and training, control of work systems, and process safety culture and leadership. In the US, BP has committed to increase spending to an average of $1.7 billion per year through 2010 to improve the integrity and reliability of its refining assets and has created an operations advisory board to assist BP America Inc.'s management in monitoring and assessing BP's US operations.
>
> *           *           *
>
> The CSB issued its final report on the Texas City incident in March 2007. Although BP disagreed with some of the findings and conclusions in the report, BP gave full and careful consideration to the CSB's recommendations and committed to implement actions in alignment with each of the CSB's recommendations. BP has many activities under way, including activities around reporting health and safety and operational incidents, and incident investigation, in response to the recommendations of the BP US Refineries Independent Safety Review Panel (the panel) (see below) to improve process safety, both at Texas City (as recommended by the CSB) and across the group.

*        *        *

**Implementing Baker Panel recommendations**

Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery. We worked to implement the recommendations of the BP US Refineries Independent Safety Review Panel (the panel), which issued its report on the incident in January 2007 . . .

We have made material progress throughout the group across all of the panel's 10 recommendations. Action can be grouped under the following headings:

**Leadership**
Our executive team carried out site visits, which included BP's five US refineries. Board members also undertook site visits, including one to the Texas City refinery. *We have consistently communicated that safe and reliable operations are our highest priority.* Our safety and operations audit group was strengthened and completed 28 audits in 2007.

**Management systems**
Implementation of our operating management system (OMS) began at a first group of sites that included all five US refineries . . . *We continued implementing the group's 'six-point plan', which focuses on key priorities for investment and action associated with safe operations* . . .

**Knowledge and expertise**
We established an executive-level training programme, ran process safety workshops and launched an operations academy for site-based staff to enhance process safety capability.

Specialists have been deployed at our US refineries to accelerate priority improvement programmes.

**Culture**
To reinforce the need for a stronger safety culture, our in-house team undertook assessments of BP's safety culture, supported by communication from leadership.

**Indicators**
Progress has been made in developing leading and lagging

indicators, building on metrics already reported to executive management. These include measures on the competency of employees in roles critical to safety and on the development of appropriate operating procedures. We are working with the industry to develop indicators and this already includes progress to agree a metric covering loss of primary containment.

\*        \*        \*

*– We have continued to improve the way in which we seek to ensure our operations maintain compliance with health and safety laws and regulations.*

\*        \*        \*

In combination with our efforts to improve process safety, we have continued to strive for excellence in occupational health and safety. This is in line with our aspiration of no accidents, no harm to people and no damage to the environment.

\*        \*        \*

We recognize that the health and safety of our workforce and communities is affected by our operations . . . .

**Implementation of the OMS**

We began implementation of the OMS at 12 representative pilot sites. Learnings from these pilots will be used to assess and improve the OMS before widening its introduction. We intend for the whole of BP to have commmenced use of the OMS by the end of 2010.

*The OMS incorporates BP's principles for operating and provides a framework to help deliver competence, then excellence, in operations and safety. Standards for control of work and integrity management and detailed 'practices' in matters such as risk assessment provide further underpinning. Training and development programmes have been strengthened to develop the right capability and culture across the organization.*

As described by BP's group chief executive, the OMS ''is the foundation for a safe, effective, and high-performing BP. It has two purposes: to further reduce HSE risks in our operations and to continuously improve the quality of those operations''. The system's 'elements of operating' describe eight dimensions of how people, processes, plant and performance operate within BP. A continuous improvement process drives and sustains improvement of these elements at a local level.

**Capability development**
*We have initiated development programmes designed to ensure that BP has the capability among its people to achieve operational excellence and identify and manage risks.*

The programmes support implementation of the OMS by developing technical knowledge and skills.

They seek to improve management, behavioural, cultural and leadership skills to drive and sustain multi-year change in operations across multiple geographies.

*     *     *

The Operations Academy, provided in partnership with the Massachusetts Institute of Technology, is directed towards senior operations and safety leaders of sites or large units.

The executive operations programme targets group vice presidents and senior business leaders with accountability for multiple operations or sites.

Its purpose is to deepen insight into manufacturing and operations activities and the consequences of leadership decisions.

In 2007, we began the development of programmes for the wider workforce such as technicians and operators, graduate new hires and managers in roles between supervisory and senior leadership levels.

*     *     *

**Our operations and the environment**

During 2007, we continued to use environmental management systems to seek improvements on a wide range of environmental issues.

*     *     *

Following its approval in November 2006, we began the implementation of the group practice called the Environmental Requirements for New Projects (ERNP). This practice is a full life-cycle environmental assessment process. It requires all new projects to undertake screening to determine the potential environmental sensitivities associated with the proposed projects. The highest level of environmental sensitivity in a new project requires more rigorous specific environmental management activities.

21

\*        \*        \*

Deepwater Gulf of Mexico is our largest area of growth in the US.

60.     On February 24, 2009, Defendant Sutherland signed a "Chairman's Letter" which was disseminated to BP shareholders.  In this letter, Defendant Sutherland stated that all of BP's activities "need to take place against a very clear view of risk," and expressed his belief that "the BP board and its committees have set a high standard in this regard and we continue to improve the manner in which we understand and evaluate risks whether they be strategic, geopolitical, compliance or operational."  Further, Defendant Sutherland stated that the Gulf of Mexico was a "showcase for BP's deepwater skills and technology."

61.     Also on February 24, 2009, Defendant Hayward answered questions in the "Group chief executive's review," which was disseminated to BP shareholders.  When asked what his priorities were for BP, Defendant Hayward replied "[s]afety, people and performance, and these remain our priorities.  Our number one priority was to do everything possible to achieve safe, compliant and reliable operations."  Defendant Hayward then stated that "[s]afety must inform every decision and every action.  The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed."  Defendant Hayward further stated that BP was "also committed to high ethical standards and legal compliance in all aspects of our business," and that BP had continued to "enhance and improve compliance programmes . . ."  Finally, Defendant Hayward stated that BP had "made good progress on achieving safe, compliant and reliable operations."

62.     On March 4, 2009, BP filed its Annual Report with the SEC on Form 20-F.  The Company's Form 20-F stated, in relevant part:

**Safety**
*[W]e continue to seek to secure the safety of all members of our workforce*. . . .

***Throughout 2008, senior leadership across the group continued to hold safety as their highest priority.***

\*     \*     \*

**Management systems**

We continue to implement our new operating management system (OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site.

\*     \*     \*

In addition to ongoing training programmes we are undertaking a group wide programme to enhance the capability of our staff from front line to executive level to deliver operational excellence.

\*     \*     \*

***We remain fully committed to becoming a recognized industry leader in process safety management and are working to achieve this.*** We have taken a range of steps, including acting on the recommendations from both the panel and those within the first annual report of the independent expert.

\*     \*     \*

• Executive management has taken a range of actions to demonstrate their leadership and commitment to safety. The group chief executive has consistently emphasized that safety, people, and performance are our top priority, a belief made clear in his 2007 announcement of a forward agenda for simplification and cultural change in BP. Safety performance has been scrutinized by the Group Operations Risk Committee (the GORC), chaired by the group chief executive and tasked with assuring the group chief executive that group operational risks are identified and managed appropriately. We continued to build our team of safety and operations auditors. A team of 45 auditors is now in place, with 36 audits completed in 2008.

• Many of the process-safety related improvements recommended by the panel are being implemented across the group through the

OMS. The group essentials within the OMS (which cover diverse aspects of operating activity including legal compliance, process and environmental safety and basic operating practices) in some cases go beyond the panel's process safety recommendations, a point noted by the independent expert in his first report. In addition to action in these areas, we have continued to participate in industry-wide forums on process safety and have made efforts to share our learning with other organizations.

The independent expert has been tasked with reporting to the board on BP's progress in implementing the panel's recommendations. We welcome the independent expert's view expressed in his first report (May 2008) that BP '*appears to be making substantial progress in changing culture and addressing needed process safety improvements*'.

       *      *      *

We continue to implement the Control of Work and Integrity Management standards. We have made progress in ensuring our operations meet the requirements of a group framework designed to ensure we stay in compliance with legal requirements on health and safety. We are continuing to take steps to close out past audit actions. Leadership competency assessments, which involve assessment of the experience of BP management teams responsible for major production sites or manufacturing plant, have been completed in Exploration and Production and in all major Refining and Marketing manufacturing sites.

Implementation of these actions is expected to be largely complete by the end of 2009, with some aspects of implementation being incorporated into the transition to the OMS, expected to be completed by the end of 2010. The GORC regularly monitors progress against the plan.

       *      *      *

**Performance indicators**
We have well-developed systems, processes and metrics for reporting personal safety and environmental metrics that support internal performance management as well as public reporting.

We introduced several new metrics in 2008 that aim to enhance our monitoring of process safety performance within BP's operating entities. These include, for example, a process safety incident index, as recommended by the panel, which uses weighted severity scores to record and assess process safety events, and a measure to record any loss of hydrocarbon from primary

containment.

          *     *     *

Deepwater Gulf of Mexico is our largest area of growth in the US.

63.     On March 25, 2009, Defendant McKay spoke at the Howard Weil Energy Conference.  His remarks included the following:

> Managing costs down does not mean BP will be skimping when it comes to ensuring our operations remain safe, reliable and compliant in the years ahead.  Safety will continue to have first call on the company's resources.

64.     On November 19, 2009, David Rainey, Vice President for Gulf of Mexico Exploration for BP America, Inc. testified in front of and submitted written statements to the United States Senate Energy and Natural Resources Committee.  His written statements included the following assertions:

> ***Releases from oil and gas operations are rare, and the application of technology has enabled a dramatic reduction in releases from our industry over the last 30 years.*** . . . we continue to invest in research and technology to drive us to our ultimate goal of zero discharge.
>
> Examples of the technologies which have helped to reduce accidental releases include:
>
> •     Down hole flow control valves that shut down the well automatically if damage to the surface equipment is detected;
>
> •     Blowout preventer technology which includes redundant systems and controls;
> •     New and improved well control techniques which maintain constant control of the fluids in the wellbore;
> •     Sensors which continually monitor the subsurface and seabed conditions for sudden changes in well pressures; and
> •     BP's fiber optic network in the US Gulf of Mexico which allows us to monitor well pressures in real time, both at the facility and in our offices in Houston.
>
> While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies.  ***All***

*of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents.*

**Offshore Technologies Enabling Environmental Stewardship**

*Three key technologies which enable the safe and reliable production of offshore oil and gas resources:*
- *Seismic imaging;*
- *Offshore drilling; and*
- *Offshore production systems.*

Seismic imaging allows us to predict the presence of hydrocarbon reservoirs below the sea bed.  Drilling allows us to test for the presence of hydrocarbons in the reservoirs.  When hydrocarbons are present, the well bore connects the reservoir to the surface, where production systems enable us to produce the hydrocarbons, and deliver them safely to the refinery.

Our industry has a remarkable track record of moving forward the limits of each of these technologies. In BP, we have been at the forefront of both the development of the technologies, and their application . . .

\*       \*       \*

*BP has been at the forefront of this recent phase of deepwater development.*  Today, we operate eight major producing facilities in the US Deepwater Gulf of Mexico.  They range from the Pompano fixed platform, installed in 1994 in 1,300 feet of water, to the Atlantis semi-submersible platform, which started production in 2007 and sits in 7,100 feet of water.

65.   On February 26, 2010, BP disseminated its 2009 Annual Review to investors.

The Company's 2009 Annual Review set forth, in relevant part:

[Defendant Svanberg]: We must never shrink from taking on difficult challenges, but the board will strive to set high expectations of how risk is managed and remain vigilant on oversight.

\*       \*       \*

[Defendant Hayward]: [In 2009] a revitalized BP kept up its momentum and delivered strong operating and financial results while continuing to *focus on safe* and reliable operations.

Replacement cost profit for the year was $14 billion, with a return

26

on average capital employed of 11%. . . .

In the Gulf of Mexico we ramped up production at Thunder Horse to more than 300,000 barrels of oil equivalent per day. Production started from Atlantis Phase 2, Dorado and King South. And in September we announced the Tiber discovery, the deepest oil and gas discovery well ever drilled. These successes make us the largest producer and leading resource holder in the deepwater Gulf of Mexico. . . .

BP has always operated at the frontiers of the energy industry and our core strengths are more relevant and valuable than ever. BP's experience, skills, capability, technology and access to markets enable resource holders to maximize returns over the long term. We continue to show our ability to take on and manage risk, doing the difficult things that others either can't do or choose not to do.

*       *       *

Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency. Alongside mandatory practices to address particular risks, OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework.

*       *       *

[Defendant Inglis]: ***Safety, both personal and process, remains our highest priority. 2009 brought further improvement in personal safety*** with the segment's reported recordable injury frequency improving from 0.43 in 2008 to 0.39 in 2009. . . .

BP is the leading operator in the deepwater Gulf of Mexico. We are the biggest producer, the leading resource holder and have the largest exploration acreage position.

66.     Also on February 26, 2010, Defendant Svanberg signed a "Chairman's Letter" which was disseminated to BP shareholders.  In this letter, Defendant Svanberg said of the executive team, under the leadership of Defendant Hayward: "[t]heir focus on safety, operational performance and culture has produced great results across the group . . ."  Defendant Svanberg further stated that BP's "board will strive to set high expectations of how risk is managed and

remain vigilant on oversight."

67.     Similarly on February 26, 2010, Defendant Hayward answered questions in the "Group chief executive's review," which was disseminated to BP shareholders.  When asked about the priorities he had set for BP, Defendant Hayward responded "[o]ur priorities have remained absolutely consistent—safety, people and performance … Achieving safe, reliable and compliant operations is our number one priority and the foundation stone for good business."

68.     On March 5, 2010, a mere month and a half before the Deepwater disaster, BP filed its Annual Report with the SEC on Form 20-F.  The Company's Form 20-F stated, in relevant part:

> **The priorities that drove our success in 2009 – safety, people and performance – remain the foundation of our agenda** as we build on our momentum and work to further enhance our competitive position.
>
> *       *       *
>
> **Safe, reliable and compliant operations remain the group's first priority.** A key enabler for this is the BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency. OMS includes mandatory practices, such as integrity management and incident investigation, which are designed to address particular risks. In addition, it enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework.
>
> *       *       *
>
> **Good progress has been made on underpinning improved safety performance in 2009. Throughout the year, we continued to focus on training and enhancing procedures across the organization.** Significantly, 2009 was an important year in the development of OMS. By the end of 2009, around 80% of our operating sites were using the system, including all our operated refineries and petrochemicals plants.
>
> *       *       *
>
> **In Exploration and Production, safety, both personal and process, remains our highest priority.**
>
> *       *       *
>
> **Our priorities remain the same — safety, people and**

*performance, focusing on the delivery of safe, reliable and efficient operations.* In 2010, we aim to use the momentum generated in 2009 to continue to improve operational, cost and capital efficiency, *while ensuring we maintain our priorities of safe, reliable and efficient operations.*

\* \* \*

**Deepwater Gulf of Mexico:**
*Deepwater Gulf of Mexico is our largest area of growth in the US.* In addition, we are the largest producer and acreage holder in the region.

\* \* \*

• In June 2009, the Atlantis Phase 2 (BP 56%) project achieved first oil ahead of schedule, signalling the official start-up.

\* \* \*

**Safety**
*Safety, people and performance are BP's top priorities. We constantly seek to improve our safety performance through the procedures, processes and training programmes that we implement in pursuit of our goal of 'no accidents, no harm to people and no damage to the environment'.*

\* \* \*

*Our mandatory internal requirement to undertake incident investigations seeks to ensure that we learn as much as possible from each incident and take action to prevent re-occurrence.*

\* \* \*

**Process safety management**
We continued to implement the 2007 recommendations made by the BP US Refineries Independent Safety Review Panel (Panel), which following the incident at Texas City in 2005, reviewed process safety management at our US refineries *and our safety management culture.*

\* \* \*

During the course of 2009, we also provided regular progress updates to the Safety, Ethics and Environment Assurance Committee of the board . . .

69.    On March 22, 2010, less than a month before the Deepwater disaster, Defendant

Inglis spoke at the Howard Weil Conference in New Orleans.  His prepared remarks included the

following:

> We are currently planning to make final investment decisions for 24 new major projects in the next two years. Each project has been high-graded through our project selection and progression process. They are concentrated in the Gulf of Mexico, the North Sea, Azerbaijan and Angola – high margin production areas that improve the portfolio and enable profitable growth.
>
>         *        *        *
>
> Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance. And I am pleased to say that in 2009 we saw continuing improvement in all aspects.

70.    The statements contained in ¶¶50-69 were materially false and misleading when made because defendants failed to disclose or indicate the following:  (1) that BP had recklessly inefficient and wholly inadequate safety procedures; (2) BP's conducted its operations in the Gulf without any legitimate oil spill response plan; (3) that BP was wholly incapable of adequately responding to deepwater events in the Gulf; (4) that BP understated the risks of investing in BP while overstating its ability to extract oil from the Gulf; (5) that the Company lacked adequate internal and safety controls; and (6) that, as a result of the foregoing, the Company's financial statements, public statements and presentations were materially false and misleading at all relevant times.

## LOSS CAUSATION/ECONOMIC LOSS

71.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of BP ADSs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of purchases of BP's ADSs during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities

laws.

72.     The truth about BP's operations slowly emerged following the April 20, 2010 explosion on the Deepwater Horizon and BP's inept efforts to control the oil leaking into the Gulf.  Immediately prior to the explosion, BP's ADS traded at approximately $60.00 per ADS. Following the explosion, BP shares began a nearly continuous decline.  For example, on April 30, 2010, when the oil slick caused by the disaster reached Louisiana's coastline, BP ADS closed at $52.15 per ADS, a decline of nearly $8.00 per ADS since April 20, 2010.  The declines are directly related to the market absorbing information revealing risks concealed by BP throughout the Class Period, specifically that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming the culture of BP were false.

73.     In the days and weeks that followed, additional news and information emerged on a seemingly continuous basis further revealing BP's wanton  disregard for conducting its operations in a safe manner and the lack of any legitimate spill response plan by BP.  These revelations caused BP's ADSs to plummet further.

74.     On May 6, 2010, BP commenced its attempt to contain the spill with a large dome-like structure, to be placed over the Macondo well.  On May 10, 2010, BP disclosed that the containment dome efforts had failed.  Moreover, tar had begun to wash up on the Alabama coast.  As a result, on May 10, 2010, BP ADS closed at $48.75 per ADS, a decline from the previous day's closing price of $49.06 per ADS.  The decline is directly related to the market absorbing information revealing risks concealed by BP throughout the Class Period, specifically that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming the culture of BP were false.

75.     On May 12, 2010, *Bloomberg* published an article entitled "BP Tells Congress Gulf Well Failed Tests Before Blast."  The article stated, in relevant part:

> A Gulf of Mexico oil well failed a pressure test hours before a drilling rig exploded last month, an executive for well owner BP Plc told the U.S. House Energy Committee that's investigating the incident.
>
> Such pressure tests are aimed at ensuring the integrity of cement poured into the well to keep out natural gas, said Committee Chairman Henry Waxman, a California Democrat, citing a report to the panel from James Dupree, BP senior vice president for the Gulf. The tests before the April 20 blast showed "discrepancies" in pressure levels, Waxman said.
>
> "There was something happening in the well bore that shouldn't be happening," Steven L. Newman, chief executive officer of rig owner Transocean Ltd., said today in testimony.
>
> * * *
>
> **"BP, one of the largest oil companies, assured Congress and the public that it could operate safely in deep water and that a major oil spill was next to impossible," Waxman said. "We now know those assurances were wrong."**
>
> * * *
>
> **'Serious Questions'**
>
> "BP promised to make safety its number one priority," Stupak said. "This hearing will raise serious questions about whether BP and its partners fulfilled this commitment. The safety of its entire operations rested on the performance of a leaking and apparently defective blowout preventer."

76.     These revelations caused BP ADSs to close at $48.50 per share on May 12, 2010, a decline of $0.24 per ADS from the previous day's closing price and approximately $11.50 per ADS since April 20, 2010.

77.     On May 13, 2010, *The Wall Street Journal* published an article entitled "Red Flags Were Ignored Aboard Doomed Rig."  This article stated, in relevant part:

Managers at oil giant BP PLC decided to forge ahead in finishing work on the doomed Deepwater Horizon rig despite some tests suggesting that highly combustible gas had seeped into the well, according to testimony released by congressional investigators and documents seen by *The Wall Street Journal*.

78.     Also on May 13, 2010, *The Wall Street Journal* published an article entitled "BP's Hayward Says Company Could Have Done More Disaster Preparation."  This article stated, in relevant part:

> BP has been particularly vulnerable to criticism, because among the large oil companies it is by far the biggest player in deepwater oil exploration. ***Some in the industry have said a company with such a strong focus on deepwater drilling should have had much better contingency plans for dealing with a subsea oil leak at this depth.***
>
> ***Mr. Hayward, in an interview with a small group of journalists Wednesday night, admitted the U.K.-based oil giant had not had the technology available to stop the leak, and said in hindsight it was "probably true" that BP should have done more to prepare for an emergency of this kind.***
>
> "It's clear that we will find things we can do differently, capability that we could have available to deploy instantly, rather than be creating it as we go," he told a group of reporters in Houston.

79.     On May 13, 2010, as a result of these continuing revelations about BP's operations, BP ADSs closed at $48.10 per ADS, $0.40 per share below the previous day's closing price.  The decline is directly related to the market absorbing information revealing risks concealed by BP throughout the Class Period, specifically that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming the culture of BP were false.

80.     On May 16, 2010, BP announced that it would attempt a containment effort with a tube that was meant to siphon off a large portion of the leaking oil.  On May 19, 2010, BP announced that this effort had also failed.  On that day, BP ADS closed at $45.27 per ADS.

81.     On May 26, 2010, BP began its "top kill" efforts, the goal being to put heavy kill mud into the well so that it reduced the pressure and then the flow from the well.  However, on May 29, 2010 (a Saturday), BP revealed that this too had failed.

82.     Also on May 29, 2010, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  This article stated, in relevant part:

> Internal documents from BP show that there were serious problems and safety concerns with the Deepwater Horizon rig far earlier than those the company described to Congress last week.
>
> *             *             *
>
> The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control." And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.

83.     On June 1, 2010 (the first trading day since the failure of the "top kill" effort), United States Attorney General, Eric Holder, reported that the DOJ opened formal criminal and civil probes of BP.  News of the Attorney General's action and BP's inability to cap the well with its "top kill" procedure sent its ADSs tumbling nearly 15%, to close on June 1, 2010 at $36.52 per ADS, on heavy trading volume.  This closing price represented a cumulative decline in the value of BP's ADSs of nearly $24.00 per ADS since April 20, 2010, or approximately 40%.  The decline is directly related to the market absorbing information revealing risks concealed by BP throughout the Class Period, specifically that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming the culture of BP were false.


**Post Class Period Developments**

84.     On June 2, 2010, the *Financial Times* published an article entitled "BP 'not

34

prepared' for deep-water spill."  This article was notable for its quotes from Defendant Hayward, which essentially admitted that BP's spill response plans were ineffective.  The article stated, in relevant part:  "BP did not have all the equipment needed to stop the leak from its Macondo well in the Gulf of Mexico in the aftermath of the explosion on an oil rig six weeks ago, the UK company's chief executive admitted."   The article quotes Hayward admitting that "What is undoubtedly true is that we did not have the tools you would want in your tool-kit. . . ." Hayward further accepted it was "an entirely fair criticism" to say the Company had not been fully prepared for a deep-water oil leak.

85.    On June 3, 2010, Fitch and Moody's downgraded BP.  Fitch stated that the "downgrade of BP's ratings reflects Fitch's opinion that risks to both BP's business and financial profile continue to increase following the Deepwater Horizon accident . . ." Similarly, Moody's "expects . . . [clean-up] costs to weigh significantly on BP's free cash flow generating capacity and to constrain its ability to focus on other key areas of the company's business in the near to intermediate term. . . ."

86.    On June 16, 2010, after a meeting with President Obama, BP agreed to set aside $20 billion in an escrow account to compensate victims.  The following day Hayward appeared before a Congressional committee and was accused by Congressional leaders of "stonewalling" the committee's investigation.  Congressman Waxman bluntly asked Hayward:  "Are you failing to cooperate with other investigators, as well . . .  Because they're going to have a hard time reaching conclusions if you stonewall them, which is what we seem to be getting today." Congressman Waxman, who has been reviewing BP documents, also stated "BP's corporate complacency is astonishing. . .  BP cut corner after corner to save a million dollars here and a few hours or days there. And now the whole Gulf Coast is paying the price."

87.     As of the filing of this Complaint, BP has not contained the oil leaking into the Gulf.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased BP ADSs during the Class Period and who suffered losses therefrom (the "Class").  Excluded from the Class are defendants, directors and officers of BP and their families and affiliates.

89.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

90.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Securities Exchange Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the prices of BP ADSs were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

91.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

92.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

93.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SCIENTER ALLEGATIONS

94.     During the Class Period, the defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of BP's securities (as set forth herein) during the Class Period.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

95.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(g)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(h)     The omissions and misrepresentations were material;

(i)     The Company's ADSs traded in an efficient market;

(j)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and

      (k)      Plaintiff and other members of the Class purchased BP ADSs between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

96.    At all relevant times, the market for BP ADSs was efficient for the following reasons, among others: (a) BP filed periodic public reports with the SEC; and (b) BP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## NO SAFE HARBOR

97.    Defendants' "Safe Harbor" warnings accompanying their forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

98.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of BP who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Defendants BP, plc, BP America, Inc.,
### Hayward, Browne, Inglis, Svanberg, McKay and Sutherland

99.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

100.    During the Class Period, BP and defendants Hayward, Browne, Inglis, Svanberg, McKay and Sutherland carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase BP ADSs at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, these defendants, and each of them, took the actions set forth herein.

101.    BP and defendants Hayward, Browne, Inglis, Svanberg, McKay and Sutherland: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADSs in an effort to artificially inflate and maintain the market prices for BP ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

102.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

103.    The Individual Defendants acted as controlling persons of BP within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions,

and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading and/or omitted material information.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

104.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

105.    As set forth above, BP and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(l)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(m)     Awarding compensatory damages and equitable relief in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(n)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(o)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated:  June 30, 2010                              Respectfully submitted,

                                                   **LOWE, STEIN, HOFFMAN,
                                                   ALLWEISS & HAUVER, L.L.P.**

                                                   /s/ Mitchell J. Hoffman
                                                   MITCHELL J. HOFFMAN (#6896)
                                                   SERENA E. POLLACK (#32682)
                                                   JEFFREY M. HOFFMAN (#29253)
                                                   701 Poydras Street, Suite 3600
                                                   New Orleans, Louisiana  70139-7735
                                                   Telephone: (504) 581-2450
                                                   Facsimile: (504) 581-2461


                                                   **BARROWAY TOPAZ KESSLER
                                                   MELTZER & CHECK, LLP**
                                                   SEAN M. HANDLER
                                                   DARREN J. CHECK
                                                   NAUMON A. AMJED
                                                   280 King of Prussia Road
                                                   Radnor, PA 19087
                                                   (610) 667-7706
                                                   (610) 667-7056 (fax)

                                                   -and-

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
RAMZI ABADOU
580 California Street, Suite 1750
San Francisco, CA 94104
(415) 400-3000
(415) 400-3001 (fax)

*Attorneys for Plaintiff*